Rossi v. Pelham                                    CV-96-139-SD 09/29/97 P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Cheryl B. Rossi


    v.                                      Civil No. 96-139-SD


Town of Pelham;
Peter R. Flynn, individually
 and in his capacity as
 Pelham Administrative Ass't;
Paul R. Scott, individually
 and in his capacity as Vice-
 Chairman of the Pelham Bd. of
 Selectmen;
David Rowell, individually
 and in his capacity as
 Pelham Police Chief


**O R D E R**


    In this civil rights action, plaintiff Cheryl B. Rossi, who was serving as town clerk and town tax collector for the Town of Pelham, New Hampshire, claims that Pelham officials unlawfully searched her office at the town hall and unlawfully seized her person and her property by placing a police guard in her office to watch over her on her last day of service.  Rossi also alleges numerous state law claims arising out of the same facts.

    At issue before the court is defendants' motion for summary judgment and plaintiff's objection thereto.

Statement of Facts

Plaintiff Rossi was serving as town clerk and town tax collector for the Town of Pelham, New Hampshire, a position which she held for 23 years. In 1993, Rossi lost her bid for reelection to those offices. New Hampshire law requires a succession audit when the position of town tax collector passes to a successor. New Hampshire Revised Statutes Annotated (RSA) 41:36 provides: "Whenever the term of office of a collector of taxes shall end . . . [t]he selectmen shall cause an audit of his accounts to be made promptly." Rossi contacted the town's auditing firm to make arrangements for the required succession audit. She spoke with Paul Mercier at the firm, who told her that the audit would take place on Monday, March 15, 1993. During their conversation, Rossi told Mercier she planned to take home for the weekend the books and records she kept as town tax collector in order to prepare for the Monday audit. Later, in a conversation with defendant Peter Flynn, a member of the Pelham board of selectmen, Mercier mentioned Rossi's plans to remove the books and records from the town hall to her house. In turn, Flynn relayed word of Rossi's plan to defendant Paul Scott, another selectman.

Selectman Scott convened a meeting of the board of selectmen to inform them of Rossi's plan and to discuss what, if anything,

the selectmen should do about it.  At the meeting, the selectmen voted to have defendant Police Chief David Rowell take action to prevent Rossi from removing the books and records from the town hall.  In carrying out the vote of the selectmen, Scott and Flynn prepared the following letter for Chief Rowell to deliver to Rossi:

> Please be advised that the Board of Selectmen insist that no records pertaining to Town Clerk/Tax Collector transactions be removed from the Pelham Town Hall at any time.  The Selectmen call your attention to the terms and conditions of RSA 33-A:1, III(a) and RSA 33-A:2 and :3 and RSA 5:38.  The Selectmen recognize these records are your responsibility at this time.  However, we still insist that these records remain in the Town Hall Office of Town Clerk/Tax Collector and be secured and bound in any manner you choose until the March 15, 1993 arrival of the auditors.  To insure security of these records, the Board of Selectmen have arranged that the Pelham Police Department provide adequate protection within the building.
> Thanking you for your cooperation in advance and trusting that this procedure will meet with your approval, I remain
>
> Respectfully yours,
>
> Paul R. Scott
> Vice Chairman
> Board of Selectmen

Complaint, Exhibit 1.

The letter was delivered to Rossi on the Friday before the Monday of the audit.  Defendant Rowell deployed Police Officer Robert Cunha to town hall instructing him to ensure Rossi did not remove the books and records from that building.

Officer Cunha arrived at the town hall on Friday afternoon and entered Rossi's office, announcing to her that he was acting under orders from the police chief and the selectmen. He then sat down in Rossi's private office and remained there while she worked. After 45 minutes, he moved from her office to a desk just outside her office door. Rossi decided to quit working at 7:00 p.m., at which time Officer Cunha escorted her first to the vault, where she deposited the records, and then out of the town hall.

<u>Discussion</u>

<u>Constitutional Claims</u>

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Here, Rossi claims that three distinct Fourth Amendment violations occurred when Officer Cunha positioned himself in her private office to ensure that she did not remove any work-related books and records. Rossi alleges that Officer Cunha's conduct constituted an unreasonable search of her office, an unreasonable seizure of her person, and an unreasonable seizure of her property. The court will address the claims in that order.

Rossi alleges that Officer Cunha unreasonably searched her

4

office when he entered her private office and remained there for 45 minutes.  Defendants argue that Officer Cunha's presence in Rossi's office did not constitute a "search" within the meaning of the Fourth Amendment because he intended only to prevent Rossi from leaving town hall with work-related files, rather than to discover evidence.  The dictionary defines "search" as follows: "To look into or over carefully or thoroughly in an effort to find or discover."  Webster's THIRD NEW INTERNATIONAL DICTIONARY 2048 (1976).  Likewise, the older Fourth Amendment caselaw focused on the intent to discover: "A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt . . . [and] implies exploratory investigation or quest."  Haerr v. United States, 240 F.2d 533, 535 (1957).  However, the more recent caselaw defines "search" as infringement of "an expectation of privacy that society is prepared to consider reasonable."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  A citizen's expectation of privacy may be equally infringed by random and undirected trespass as by exploratory investigation.  Under modern jurisprudence, it is irrelevant whether or not the search agent intended to discover evidence.  On this point, this court finds no distinction between Officer Cunha's in-person monitoring of Rossi and the video surveillance monitoring of public employees that has been clearly held to

5

constitute a search. Hector Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 181 (1st Cir. 1997).

Next, defendants argue that Rossi did not enjoy a reasonable expectation of privacy in her office at the town hall and that Officer Cunha's intrusion into that office therefore did not constitute a "search." In Mancusi v. DeForte, 392 U.S. 364 (1968), the Court held that employees may have a reasonable expectation of privacy in their workplace against intrusions by the police. In Oliver v. United States, 466 U.S. 170 (1984), the Court stated that such an expectation in one's place of work is "based upon societal expectations that have deep roots in the history of the Amendment." Id. at 178 n.8. The Court in Ortega, supra, 480 U.S. at 717, extended Mancusi's protection of workplace privacy to public employees, recognizing that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." Under Ortega, a public employee's office privacy is protected not only against intrusions by law enforcers, but also against work-related intrusions by public employers. Thus the Supreme Court has extended Fourth Amendment protection beyond the "paradigmatic entry" into a house by police officers in search of criminal evidence to work-related investigation of a public employee's private office. Ortega, supra, 480 U.S. at 715 (noting that "it

6

would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior'") (quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 335 (1978))).

Under Ortega, public employees may enjoy Fourth Amendment protections against unreasonable work-related intrusions in their offices, as a general matter. The qualifier indicates that, according to the Court, an employee's expectation of privacy may be undermined if co-workers, supervisors, and/or the general public enjoy by practice or procedure a general right to access the office or workplace. Ortega, supra, 480 U.S. at 718 ("[S]ome government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable."). A general right of access to an office erodes any expectation of privacy, which may not then be revived and conjured up when a state actor seeks access to that office.

According to the Court, "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." Ortega, supra, 480 U.S. at 718. The First Circuit recently surveyed the factors that federal courts consider relevant in making the case-by-case determination. Hector Vega-Rodriguez, supra, 110 F.3d at 179.

7

The circuit court identified the following factors: (1) whether the work area in question was given over to an employee's exclusive use, (2) the extent to which others had access to the work space, (3) the nature of the employment, and (4) whether office regulations placed the employee on notice that certain areas were subject to employer intrusions.  Id.

Here, there is no indication that the public or other town officials enjoyed a general right of access to Rossi's office under the practices or procedures of the work environment at town hall.  Rossi, as the town's clerk, was given exclusive access and use of the office.  She describes her offices as follows:

> I had a small private office measuring about 8 feet by 8 feet, which was just off the main office . . . [which] had five desks where my deputy and other clerks worked.  The public was served at a window.  The public did not have access to either the main office or my private office.

Affidavit of Cheryl Rossi at 2 (attached to Plaintiff's Objection).  Further, Pelham did not place Rossi on notice that her office was subject to intrusions by other town officials. From the record, it appears that the office was maintained under the practice and procedure at the town hall as Rossi's private office.

Considering the relevant factors, this court finds that Rossi enjoyed a reasonable expectation of privacy in her office at the town hall.  Thus, Officer Cunha's intrusion into her

8

private office infringed Rossi's reasonable expectation of privacy and constituted a search subject to Fourth Amendment scrutiny.

Simply because Officer Cunha's conduct may be characterized as a search does not mean it offends the Fourth Amendment, which only prohibits unreasonable searches. According to the Supreme Court, "[t]o hold that the Fourth Amendment applies to searches conducted by [state actors] is only to begin the inquiry into the standards governing such searches. . . . [W]hat is reasonable depends on the context within which a search takes place." New Jersey v. T.L.O., 469 U.S. 325, 337 (1985). The evidence is undisputed that Officer Cunha entered Rossi's office without a search warrant, and it is settled law that "'except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.'" Mancusi, supra, 392 U.S. at 370 (quoting Camara v. Municipal Court, 387 U.S. 523, 528-529 (1967)). The warrant requirement may be rejected as the governing Fourth Amendment standard of reasonableness only in those exceptional circumstances when "'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" Ortega, supra, 480 U.S. at 720 (quoting Camara v. Municipal Court, supra, 387 U.S. at 533). The question therefore

is whether Officer Cunha's warrantless search of Rossi's office falls within the carefully defined classes of cases governed by a less stringent standard of Fourth Amendment reasonableness.

The precedent most closely related to this case is Ortega, in which the Court carved out an exception to the warrant requirement for certain work-related searches. In that case, the Court was considering the appropriate standard of Fourth Amendment reasonableness applicable to a warrantless search of Dr. Ortega's private office at a state hospital conducted by Dr. Ortega's supervisor to investigate charges of Ortega's work-related misfeasance, as opposed to criminal misconduct. The Court upheld the warrantless search as reasonable and enunciated an exception to the warrant requirement "for public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct." Ortega, supra, at 725. The Court reasoned that the delay and burden of obtaining a warrant would frustrate the government purposes of work-related searches, namely, the "government's need for supervision, control, and the efficient operation of the workplace." Id. at 720. For instance, it would jeopardize the work of public agencies if a public supervisor had to obtain a warrant before entering an employee's office to obtain an

10

urgently needed correspondence, file, or report. Further, public employers, according to the Ortega Court, must have wide latitude in conducting investigations of work-related misfeasance to minimize employee inefficiency, incompetence, or mismanagement in government agencies. Otherwise, "[t]he delay in correcting the employee misconduct caused by the need [for a warrant and probable cause] . . . will be translated into tangible and often irreparable damage to the agency's work, and ultimately to the public interest." Id. at 724.

In this case, Officer Cunha's search of Rossi's office, like the search considered in Ortega, was conducted for the purpose of investigating work-related misfeasance, instead of criminal misconduct. Affidavit of Peter Flynn, Exhibit D (attached to Defendant's Motion for Summary Judgment). However, this search was a police intrusion on Rossi's privacy interests, and the Ortega exception by its express terms applies only to "public employer intrusions on the . . . privacy interests of government employees . . . ." Ortega, supra, at 725 (emphasis added). The issue is whether the Ortega exception may properly be extended to work-related searches conducted by police officers rather than by public supervisors.

It may be argued that the same reasons held by the Ortega Court to justify a public supervisor's warrantless searches of a

11

public employee's private offices likewise justify a police officer's warrantless search of that same office. Ortega may be understood as recognizing that the ends of workplace efficiency necessitate and justify warrantless searches of public employees' private offices by a state actor with the requisite authority, but a state remains free to choose which of its agents, whether a police officer or a supervisor, will be deployed to effectuate the necessary warrantless search. Federal constitutional law does not define limits on the otherwise lawful purposes or ends for which police officers may be used, and there are no essential police functions. The police have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses." ABA STANDARDS FOR CRIMINAL JUSTICE § 1-1.1 (2d ed. 1980). Under federal law, states may use police officers to pursue the goals of workplace efficiency in public agencies. Thus, once it is recognized that the goals of workplace efficiency justify a warrantless search of an employee's private office, it may be argued that it is constitutionally insignificant whether the searcher is a police officer or a supervisor.

However, this argument must be rejected. The status of the searcher, whether police officer or supervisor, bears on the constitutional reasonableness of a warrantless search of a public

employee's private office.  Generally, an exception to the warrant requirement is only appropriate in "carefully defined classes of cases," Mancusi, supra, 392 U.S. at 370 (emphasis added), and extends only as far as the necessity from which it was borne.  The Court in Ortega defined an exception for "public employer[s]," and it is unnecessary to extend that exception to police searches of public employees' private offices.  If workplace efficiency demands an immediate warrantless search of the office, the search may be conducted by the employee's supervisor.  Given this, there is no reason to deploy a police officer, whose invasion of the private office is inherently more intrusive than an equally effective search by the employee's supervisor.  The workplace efficiency of public agencies will not suffer for the delay of requiring a police officer to obtain a warrant before searching private offices because the supervisor may conduct an immediate warrantless search under Ortega.  Thus, extending Ortega's warrant exception to police searches of public employees' offices would be unnecessary, gratuitous, and inappropriate.

It is a fundamental tenet of American jurisprudence that "'[i]n every case [state power] must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.'"  Buckley v. Valeo, 424 U.S. 1, 238 (1976) (Burger, J.,

13

concurring) (quoting <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 304 (1940)).  "Unduly" means more than necessary, and the enunciated principle confines the government to the least intrusive means adequate to achieve its goals.  "'Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" <u>Buckley</u>, <u>supra</u>, 424 U.S. at 239 (quoting <u>Shelton v. Tucker</u>, 364 U.S. 479, 488 (1960)).  The least intrusive means test has been held to govern some aspects of Fourth Amendment jurisprudence.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 490-500 (1983) ("the investigative methods employed [by an officer conducting a Terry stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. . . .  The scope of the detention must be carefully tailored to its underlying justification."); <u>United States v. Sanders</u>, 719 F.2d 882, 887 (6th Cir. 1983) (same); <u>but see</u> <u>United States v. Sokolow</u>, 490 U.S. 1, 11 (1988) ("The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."); <u>United States v. LaFrance</u>, 879 F.2d 1, 4 (1st Cir. 1989) ("The result [of the district court's analysis] was to create a standard tantamount to requiring government agents to adopt the

14

least intrusive means possible. In the package detention milieu, we think this was plain error.").

Even though the extent to which the least intrusive means requirement is appropriate in Fourth Amendment jurisprudence is unsettled, this court believes that a warrantless search should not be upheld as constitutional unless it was the least intrusive means to achieve the governmental purpose. The well-established test for an exception to the warrant requirement is "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." Camara, supra, 387 U.S. at 533. This test implies a least intrusive means inquiry. The burden of obtaining a warrant would not frustrate the governmental purpose behind the search if an alternate, less intrusive means than the search will nonetheless fully realize that governmental purpose, stripping away the necessity of a warrantless search. Thus the test for a warrant exception is not met when a less intrusive means than the warrantless search will fully realize the governmental purpose.

The Supreme Court has implied as much in Cady v. Dombrowski, 413 U.S. 433, 447 (1972). In Cady, the Court upheld a warrantless search of an off-duty police officer's automobile. The officer was arrested for drunk driving, and the arresting officers searched his automobile for the purpose of removing his

15

service revolver from the abandoned vehicle. The Court upheld the warrantless search because of the "immediate . . . concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." Id. at 447. The test for an exception to the warrant requirement was met because the burden and delay of obtaining a warrant for the search would have frustrated the governmental purpose of the search, which was a concern for public safety. Of particular import here, the Court observed, "While perhaps in a metropolitan area the responsibility to the general public might have been discharged by the posting of a police guard during the night, what might be normal police procedure in such an area may be neither normal nor possible in [a rural community]." Id. This implies that the availability of a less intrusive means, the posting of a police guard, even if not "by itself" a dispositive factor, would have been a factor in judging the reasonableness of the warrantless search, if it had been available in fact, as opposed to "in the abstract," or in a metropolitan rather than a rural community.

Warrantless work-related searches conducted by police should not be upheld under the Ortega exception because a lesser intrusive warrantless search by the employee's supervisor will fully realize the concern for workplace efficiency. A work-

16

related search of an employee's private office is more intrusive when conducted by a police officer rather than the employee's supervisor. As a general matter, the intrusiveness of a search depends in part on the status of the searcher and his relation to the suspect. Justice Scalia confirms this in his Ortega concurrence, arguing that "[t]he identity of the searcher (police v. employer) is relevant . . . to whether the search of the protected area is reasonable." 480 U.S. at 731 (Scalia, J., concurring). This is well-founded in reason. An expectation of privacy is a characteristic or attribute of legal relationships, conferring upon citizens the legally enforceable right to be left alone rather than being compelled into unwanted interaction with others. Obviously, different types of legal relationships are defined by different characteristics, including the nature and scope of any privacy expectations. For instance, a person's expectation of privacy assertible against his neighbor differs significantly from that assertible against his family, and, for that reason, invasion of the person's private study by his neighbor is more intrusive than a similar invasion by his family members.

It has been generally recognized that the relationship between public employees and their supervisors is characterized by a diminished expectation of privacy with respect to office

17

privacy.  <u>National Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 671 (1989).  In the context of the employment relationship, "[t]he operational realities of the workplace . . . may make some employees' expectation of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official."  <u>Ortega</u>, <u>supra</u>, 480 U.S. at 717.  An "office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees."  <u>Id.</u>  However, vis- a-vis police officers, an employee's office typically remains private.  Given this, searches of a public employee's office "involve a relatively limited invasion of employee privacy," <u>id.</u> at 725, when conducted by the employee's supervisor rather than by a police officer.

On the other hand, a citizen's expectation of privacy against unreasonable government intrusions is at its most robust when the intruder is a police officer.  Police officers have been vested with a coercive authority that sets them apart from other citizens, rendering self-help against unlawful police intrusions both futile and often unlawful.  <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 394 (1971).  The Massachusetts Supreme Judicial Court has noted that the law should honor a stronger expectation of privacy against those who are "formally affiliated with the sovereign and generally possess

authority beyond that of an ordinary citizen in matters such as arrest and the use of weapons." <u>Commonwealth v. Leone</u>, 435 N.E.2d 1036, 1040 (Mass. 1982).  Likewise, the United States Supreme Court has recognized that the exercise of coercive authority distinguishes the more intrusive invasions on privacy by law enforcement officials from the less intrusive invasions by other citizens.  <u>Bivens</u>, <u>supra</u>, 403 U.S. at 394.  It is on these grounds that a police search of an employee's private office may be distinguished from a search by the employee's supervisor.  The typical employment relation between a public employee and his supervisor is characterized by a formal equality between two co-citizens counseling a more limited constitutionally protected expectation of privacy.  Thus, a search of an employee's private office intrudes upon a stronger expectation of privacy when conducted by a police officer rather than a public employer.

It may be argued, albeit erroneously, that Officer Cunha and Rossi did not have the traditional police-citizen relation because Officer Cunha was acting at the behest of Rossi's public employer.  Officer Cunha was investigating work-related misfeasance, not criminal activity, on behalf of the state in its capacity as employer, as opposed to law enforcer.  For this reason, it may be contended that Rossi enjoyed only the diminished expectation of privacy that characterizes employment

19

relations. However, this contention must be rejected because citizens enjoy a heightened expectation of privacy against police officers, regardless of the object of the officer's conduct. It is the coercive authority vested in police officers that renders a police invasion of privacy more onerous than an invasion by another citizen, and police are vested with the same degree of coercive authority, regardless of the object of their conduct. Under no circumstances may the relation between a police officer and a citizen be characterized as one based on formal equality. Furthermore, since police officers traditionally function as the state's law enforcers, a police search may overtly manifest suspicion of criminal activity, even when the search is, in fact, unrelated to criminal investigation. A citizen's expectation of privacy assertible against the police does not vary according to the object of police conduct.

It is illustrative that the caselaw does not apply less rigorous Fourth Amendment scrutiny to police searches conducted for purposes other than criminal investigation unless there is some compelling urgency for the search. See e.g., People v. Wright, 804 P.2d 866, 870 (Colo. 1991) (holding unconstitutional a search of defendant's purse conducted for purposes of medical assistance because officer "was not confronted with a situation that posed a threat to the life or safety of the defendant"); see

20

also, Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) ("a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."). This supports the proposition that police searches are at the core of the Fourth Amendment, even when the police are acting outside the scope of their traditional law enforcement functions. In Specht v. Jensen, 832 F.2d 1516, 1523 (10th Cir. 1987), the court held unconstitutional a warrantless police search of the defendant's office and home conducted for the purpose of executing a civil order of repossession. The court did not consider relevant the fact that the search was not aimed at criminal investigation. In Soldal v. County of Cook, 942 F.2d 1073, 1076 (7th Cir. 1991), the court was judging the constitutionality of a police seizure of a trailer home pursuant to an eviction order. The court cited Specht as "the closest case to ours," id., because the police conduct in both cases was unrelated to criminal investigation or enforcement. The Soldal court noted that "[t]he invasion [and search at issue in Specht] was no less extensive, intrusive, or injurious just because the police were assisting a creditor

21

rather than enforcing criminal or other public law." Id. at 1076. Lastly, in Corngold v. United States, 367 F.2d 1, 5 (9th Cir. 1966), the court held unconstitutional a warrantless search of a package checked for shipment on a private airline. The package was searched by airline employees in conjunction with customs agents. From the evidence, it was unclear whether the object of the search was the custom agent's public purpose of investigating crime or the airline's private purpose of ensuring proper payment of tariffs on the package. Id. at 5. The court said that the warrantless search would be unconstitutional, even if it was assumed that the customs agents were assisting airline employees in executing a search for the airline's purposes. The only police searches in which courts have considered the non-criminal purpose of the search relevant were conducted in the context of "internal investigations." United States v. Taketa, 923 F.2d 665, 674 (7th Cir. 1991); Shields v. Burge, 874 F.2d 1201 (7th Cir. 1989); Copeland v. Philadelphia Police Dep't, 840 F.2d 1139 (3d Cir. 1988).

Since courts locate police searches at the core of the Fourth Amendment, regardless of the ends of the police conduct, it is clear that the status of the searcher, whether or not a law enforcement official, may be a more important factor than the purpose of the search in settling on the appropriate standard of

22

Fourth Amendment reasonableness. Also illustrative, "[c]ourts are understandably more ready to find a [private search] when the conduct is by a government employee without law enforcement responsibilities," 1 LaFave, Search and Seizure § 1.8(d), at 258 (3d ed. 1996), leaving many searches by non-police government actors outside the scope of constitutional protections.

The court in United States v. Blok, 188 F.2d 1019, 1021 (D.C. Cir. 1951), recognized as much, invalidating a warrantless police search of a government employee's desk for evidence of petty larceny. The court drew the following distinction: "No doubt a search of it without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use. But . . . the search that was made was not an inspection or search by her superiors." Id. at 1021. According to the court, the constitutionality of the search depended on the status of the searcher.

In Ortega, the Court enunciated an exception to the warrant requirement for "public employer intrusions on the . . . privacy interests of government employees." Ortega, supra, 480 U.S. at 725 (emphasis added). This exception should not be extended to police searches of public employees' private offices, regardless of whether the search is aimed at investigation of work-related

misfeasance or criminal misconduct.  Work-related police searches intrude on office privacy more significantly than the public employer searches considered by the Court in Ortega.  Police officers occupy a special position in our society, and for that reason police searches occupy a special position closer to the core of the Fourth Amendment.  The Ortega exception rested on the rationale that the government's need for supervision, control, and effective operation of the workplace would be frustrated if public supervisors had to obtain a warrant before searching an employee's office.  This rationale does not apply when the searcher is a police officer because concerns for workplace efficiency may be met by a lesser intrusive search by the public employer.  The closely guarded warrant requirement should not be lightly set aside for searches that are unduly intrusive. Therefore, this court holds that Officer Cunha's warrantless search of Rossi's office does not fall within the Ortega exception to the warrant requirement.  Under the general rule that "except in certain carefully defined classes of cases, a search of private property . . . is 'unreasonable' unless it has been authorized by a valid search warrant," Mancusi, supra, 392 U.S. at 370, Officer Cunha's warrantless search violated Rossi's Fourth Amendment rights.

Rossi's next Fourth Amendment claim alleges that Officer

24

Cunha's conduct amounted to an unreasonable seizure of her property because he prevented her from taking home her books and records from the Pelham town hall on that Friday. A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interest in the property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).

This court rejects defendants' claim that Officer Cunha's conduct was not a "seizure" because the scope of Rossi's property rights in the records was narrow, and the Town of Pelham, not Rossi, owned the records under state law. According to defendants, Officer Cunha did not seize Rossi's property, but was merely asserting Pelham's proprietary interest in the records. However, a seizure occurs when there is an interference with a possessory interest in property, Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994), even when another has paramount right to possession under state law. Thus police seizure of stolen property from a thief is subject to Fourth Amendment scrutiny, even though the thief does not have rightful possession under state law. Henry v. United States, 361 U.S. 98 (1959). Constitutional protection of possessory interests is not diminished when the government, as opposed to a private individual, has paramount right to possession. Warden v. Hayden, 387 U.S. 294, 300-310 (1967) ("The premise that property

25

interests control the right of the government to search and seize has been discredited.").  In <u>Lesher</u>, the Eighth Circuit held in error the district court's conclusion that no "seizure" occurred when members of the Little Rock Police Department took a police dog owned by the Department from the home of one of its officers. The circuit rejected the district court's reasoning that there can be no constitutional violation when the seizing agency owns the property allegedly seized.  The circuit said, "A government employer's seizure of property possessed by an employee is clearly subject to Fourth Amendment restraints."  <u>Lesher</u>, *supra*, 12 F.3d at 150-51.  The "constitutional right against unreasonable seizures is not vitiated merely because the defendants believed the dog belonged to the LRPD."  <u>Id.</u> at 150 (citing <u>Soldal v. Cook County</u>, ___ U.S. ___, ___, 113 S. Ct. 538, 548 (1992)).

Defendants next argue that Officer Cunha did not meaningfully interfere with Rossi's possessory interest in the records because he never made any attempt to dispossess her of custody or control of the records, which she retained for the duration of the encounter.  According to defendants, Officer Cunha merely prevented Rossi from leaving town hall with the records.  However, Officer Cunha's conduct conditioned Rossi's right to possession on her remaining at the town hall, and that condition was a sufficient interference with Rossi's possessory

26

interest, despite the fact that she technically retained full possession. In United States v. Allen, 644 F.2d 749, 751 n.2 (9th Cir. 1980), the Ninth Circuit rejected the government's claim that the briefcase of an alleged drug courier was not seized when the officer announced an intention to seize the briefcase. Rather, the government contended that the seizure did not occur until the alleged courier left the police station without the briefcase, because it was at that time that he was dispossessed of property. The court disagreed, because after the agent's statement of intent to seize the briefcase, "a reasonable person would not have believed that he or she was free to leave the station with the briefcase." Id. According to the court, a seizure of property occurred, even though the courier retained possession. Clearly, when a government official conditions a citizen's right to possession on remaining in a proscribed area-- whether in an interrogating room at an airport, as in Allen, 644 F.2d at 751, or in public offices at a town hall, as in the case at hand--by threatening to dispossess the citizen of property if the citizen attempts to leave, a seizure of property has occurred, even though the citizen does not attempt to leave and the threat to dispossess is never carried out. See e.g., United States v. Place, 462 U.S. 696, 707 (1982) ("There is no doubt that the agents made a 'seizure' of Place's luggage for purposes

27

of the Fourth Amendment when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage to a federal judge to secure issuance of a warrant.")

Rossi reasonably believed that Officer Cunha would prevent her from leaving town hall with the books and records by dispossessing her if she attempted to leave. Thus Officer Cunha's conduct conditioned Rossi's right to possession on her remaining at town hall and constituted a seizure of property subject to Fourth Amendment scrutiny.

Of course, a seizure of property is not unconstitutional unless it fails standards of Fourth Amendment reasonableness. The reasonableness determination requires a careful balancing of governmental and private interests.

The private interests compromised by the seizure of records from Rossi do not reach the level of compelling. In Place, 462 U.S. at 705-06, the Court said, "The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent. . . . [It is a] fact that seizures of property can vary in intrusiveness . . . ." Officer Cunha's seizure of the town records from Rossi was relatively nonintrusive. As discussed above, Rossi retained full possession of the records, and the seizure was constituted by a condition placed on her right of possession, which is a less intrusive

28

interference with property than formal dispossession. She enjoyed full use of the records as long as she remained at the town hall. There is no indication that Rossi wanted to make some use of the records that required her to remove them from the town offices to her home. Under those circumstances, the interference with Rossi's possessory interests was of minimal intrusiveness.

There are several governmental interests asserted in support of the warrantless seizure of Rossi's property. First, while Rossi had possession of the records at the time, the Town of Pelham retained a reversionary interest under RSA 41:36, which provides: "Whenever the term of office of a collector of taxes shall end . . . [a]ll books, records and papers of the outgoing collector shall be delivered to the selectmen by every person having possession thereof, and the selectmen shall deliver those needed for his work to the successor collector . . . ." Thus it is contended that protection of the Town's reversionary interest in the records qualifies as an important governmental interest. However, the governmental interest in enforcing a regime of property rights is no greater when the property belongs to the government than to a private individual. As an owner of property, the government is on equal footing with other private individuals. See generally Reeves v. Stake, 447 U.S. 429 (1980). In other words, a seizure of property is not more or less

reasonable depending on whether the property is owned publicly or privately. Next, the town argues that the seizure served the town's administrative interests in maintaining accurate financial records. Rossi's removal of the records from town hall may have threatened the proper administration of the town's financial affairs, which was thwarted by seizing the records from Rossi.

The court finds that, on balance, protecting the town's administrative interests justified the limited intrusion on Rossi's possessory interests in the records. For this reason, Officer Cunha's seizure of property from Rossi was reasonable, and in compliance with the Fourth Amendment.

Next, Rossi claims that Officer Cunha's conduct constituted an unreasonable seizure of her person because he restrained her freedom to leave the town hall. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1967). Officer Cunha did not restrain Rossi's freedom of movement by physical force. Nonetheless, a seizure by show of authority occurs "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446

30

U.S. 544, 554 (1980).

It is undisputed that one reason Rossi remained at the town hall was to prepare the books and records for the pending succession audit required under state law at the end of a tax collector's term. As the Court in INS v. Delgado, 466 U.S. 210, 218 (1983), pointed out, "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." In such cases, the restriction on the employee's freedom of movement has been voluntarily assumed rather than coercively imposed. In Delgado, the workers' voluntary obligation was owed to a private employer, as opposed to a public agency, as is the case here. However, the obligation to remain at work does not become less voluntary when owed to a public agency.

However, another reason Rossi remained at the town hall was to avoid being dispossessed of the books and records. Rossi wanted to finish preparing for the succession audit at home, but she believed that Officer Cunha would dispossess her of the records if she attempt to remove them from the town hall. To avoid this, she remained at the town hall to finish her work. While Rossi technically remained free to leave the town hall, she was not free to leave with the records. The Supreme Court has

31

implied that a seizure of property may translate into a seizure of person because the owner may be practically deprived of freedom to leave until the property is returned. In Place, supra, 462 U.S. at 708, the Court said:

> The precise type of detention we confront here is a seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.

By seizing the traveler's luggage, the government agents had put the traveler to the choice between his interests in liberty and property, because if he chose to leave the airport, he would be abandoning his luggage to the seizing agents. Traveling without luggage and its contents would be impracticable, so the traveler's freedom to leave was empty, and his decision to remain with his luggage was not entirely a product of voluntary choice but was, to one degree or another, coerced. Soldal, ___ U.S. at ___, ___, 113 S. Ct. at 544 n.8 ("Place also found that to detain

32

luggage for 90 minutes was an unreasonable deprivation of the individual's 'liberty interest in proceeding with his itinerary,' which also is protected by the Fourth Amendment." (quoting Place, supra, 462 U.S. at 708-10, 103 S. Ct. at 2645-46)). In most cases where a citizen decides to remain with property that is seized by a government agent, the decision is an admixture of voluntary choice and coerced compliance, and the question is which element preponderates. For instance, the voluntary elements preponderate in a case where, for example, a government agent seizes a watch from the possession of a citizen. In such a case, it would not be impracticable for the citizen to leave without his watch, as it was for the traveler in Place to leave without his luggage and its contents. Unlike Place, there is substance to the citizen's freedom to leave, and if he decides to remain with his watch rather than abandon it and make arrangements for its return later, that decision would be largely the product of voluntary attachment to the seized property. Under such circumstances, seizure of the watch does not translate into seizure of the owner.

Unlike the traveler in Place, it would not have been impracticable for Rossi to leave the town hall without the records that were seized from her possession by Officer Cunha. However, unlike the citizen in the watch example, Rossi did not

33

decide to remain at the town hall purely out of attachment to her property. Rather, if she had left the town hall, abandoning the records to Officer Cunha, she could not have fulfilled her employment duty to prepare the records for the succession audit. Under these circumstances, Rossi's freedom to leave the town hall was conditional on her disregarding a duty to her employer. Rossi's decision to remain at the town hall was partially coerced, and she was seized within the meaning of the Fourth Amendment.

Analysis now turns to the reasonableness inquiry, which entails a balance of public and private interests. The public interest served by the seizure of Rossi is the town's administrative concerns discussed above in assessing the seizure of property claim. The private interests at stake are, once again, not compelling. Rossi's decision to remain at the town hall was not entirely coerced, but was in part voluntary. As pointed out above, it would not have been impracticable for her to leave without the records, and while she would have had to disregard a duty to her employer, this was a duty that Rossi voluntarily assumed. On balance, this limited intrusion on Rossi's liberty interests was justified by the public interest in maintaining accurate financial records; therefore, the seizure was reasonable.

Qualified Immunity

Defendants Selectmen Flynn and Scott and Police Chief Rowell seek qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Government officials enjoy qualified immunity from civil damages for a section 1983 violation unless their conduct violated a "clearly established statutory or constitutional right of which a reasonable person would have known." In defining the term "clearly established right," the Supreme Court has noted that

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates a right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).

This court finds that the individual defendants Flynn, Scott, and Rowell did not violate a clearly established right. At the time the defendants acted, there was no clearly established right against warrantless work-related police searches because it would have been reasonable to conclude that such searches were permissible under Ortega, even when conducted by police officers. Thus, the unlawfulness of Officer Cunha's warrantless search of Rossi's office was not apparent, and the

35

defendants Flynn, Scott, and Rowell are therefore entitled to qualified immunity.

Municipal Liability

The Town of Pelham seeks dismissal of Rossi's section 1983 claim brought against the municipality under Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978). Under Monell, a municipality may not be held liable under section 1983 on a theory of respondeat superior solely because it employs a tortfeasor. Rather, municipal liability attaches only if a municipal "policy" or "custom" caused plaintiff's injury. Id. at 694. Only those decisions by an official whom state law vests with final decisionmaking authority over the subject matter qualify as policy. City of St. Louis v. Propotnik, 485 U.S. 112, 124-27 (1988). However, a policymaker's single decision may constitute official policy. Id.; Pembaur v. Cincinnati, 475 U.S. 469, 481 (1985).

In this case, Officer Cunha acted pursuant to orders from Police Chief David Rowell, who in turn was merely passing on orders handed to him from the board of selectmen. New Hampshire law vests the chief of police and the board of selectmen with final decisionmaking authority to direct and control town police officers in the performance of their official duties. RSA 105:

2-a states, in pertinent part,

> Subject to written formal policies as may be
> adopted by the appointing authority, each chief of
> police . . . of any city or town who is appointed
> rather than elected, shall have authority to
> direct and control all employees of his department
> in their normal course of duty . . . .

Since state law vests final decisionmaking authority in the selectmen and the police chief, their decision to deploy Officer Cunha to the town hall to search Rossi's office was official policy. Thus, summary judgment on plaintiff's Monell claim against the municipality is denied.

The Supreme Court's recent decision, Board of the County Comm'rs of Bryan County v. Brown, ___ U.S. ___, 117 S. Ct. 1382 (1997), does not undermine this conclusion. In Brown, the subject of allegedly excessive police force claimed that the municipality was liable for her injuries based on the sheriff's decision to hire the police officer who assaulted her. Specifically, the police officer had a record of violent crimes, and Brown claimed that the sheriff failed to review the officer's background adequately before hiring him. According to Brown, the sheriff's hiring decision was official policy that caused deprivation of her constitutional rights. The Court disagreed, holding that the requisite causal link between the municipal policy and the deprivation of constitutional rights could only be shown where "a municipal decision reflects deliberate

37

indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Id. at 1392. Further, the Court held that deliberate indifference could only be demonstrated if the sheriff hired the officer in disregard of a known or plainly obvious risk of the particular injury suffered by Brown. It was not enough that the sheriff may have disregarded a merely foreseeable risk of some injury; rather, "[t]he connection between the background of the particular [police] applicant and the specific constitutional violation alleged must be strong." Id.

This court believes that Brown has no application to the facts of this case. Rather, Brown was intended to govern cases where the municipal policy is not itself unconstitutional, but rather is said to cause a downstream constitutional violation. On the facts of Brown, the sheriff's decision to hire the police applicant without adequately reviewing his background was not itself unconstitutional, but Brown claimed that the sheriff's decision caused violation of her constitutional rights when the hired police applicant used excessive force against her. In such cases, the Court held that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 1389. The heightened deliberate indifference standard enunciated

38

by the Brown court was intended to ensure that a strong causal link existed between a municipal policy, by itself constitutional, and the underlying constitutional violation in order to preclude a pure respondeat superior theory of the municipality's liability.

When, as here, the policymaker specifically directs or orders the conduct resulting in deprivation of constitutional rights, there is a straightforward causal connection between the municipal policy and the constitutional violation. The municipal policymakers in this case, the selectmen and Police Chief Rowell, directed Officer Cunha to engage in the conduct that constituted a violation of Rossi's constitutional rights. Even under the most rigorous standards of causation, the causal connection between the municipal policy and violation of Rossi's constitutional rights is plain and obvious; therefore, there is no need to inquire whether the heightened deliberate indifference standard enunciated by the Brown court is met.

State Claims

Plaintiff has also asserted several state law claims, including false imprisonment, defamation, and intentional and negligent infliction of emotional distress. The claims will be addressed in that order.

39

Defendants seek summary judgment for plaintiff's false imprisonment claim on grounds that plaintiff was not unlawfully confined, but rather voluntarily remained at the town hall. According to defendants, while Officer Cunha indicated he would prevent Rossi from removing the books and records from the town hall, he did nothing to indicate to Rossi that she was not free to leave. However, as discussed above in addressing the seizure of person claim, force or threats thereof against property in the possession of another may constitute an unlawful confinement of the owner who remains to protect his property. PROSSER AND KEATON ON THE LAW OF TORTS § 11, at 50 (5th ed. 1984). "In a substantial number of cases, false imprisonment was found where one's freedom of motion was surrendered because of force directed against valuable property, as where a woman remained in a store because her purse was taken, or left a train because her suitcase was removed from it." Id. Since Officer Cunha indicated to Rossi that she was not free to leave with the books and records, he confined her.

However, the confinement was not unlawful because it was privileged. Tort law recognizes a privilege to confine another if it appears reasonably necessary in defense of property. PROSSER & KEETON at 131. Officer Cunha was defending the town's interest in the records, and the resort to self help was all the

40

more justified given the importance of the town's administrative interests that would have been compromised if the records were lost or destroyed.

Defendants next seek summary judgment on plaintiff's defamation claim premised on the selectmen's order to Police Chief Rowell directing him to place a police guard on Rossi. To establish defamation, a plaintiff must show that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Gordon T. Burke & Sons v. Indep. Mechanical Contractors, 138 N.H. 110, 118, 635 A.2d 487, 492 (1993). A communication is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community." PROSSER AND KEETON at 774. However, even if Rossi could convince this court that the selectmen's order was false and defamatory, the communication was privileged under an immunity that extends to government officials ensuring that "the administration of government should not be hampered by the fear of lawsuits." PROSSER AND KEETON at 821; Surry v. Bolduc, 112 N.H. 274, 276 (1972).

Selectmen have authority to manage the "prudential affairs" of the town, empowering them to do "'only such acts as are required to meet the exigencies of ordinary town business

41

. . . .'" <u>DeRochemont v. Holden</u>, 99 N.H. 80, 82 (1954) (quoting

<u>Moulton v. Beals</u>, 98 N.H. 461, 463). The authority to manage the

prudential affairs of the town would ordinarily include authority

to take apparently necessary measures to protect the town records

from threatened destruction. The selectmen made the allegedly

defamatory statement about Rossi to discharge the public duties

of their office, and the defamation was privileged.


<u>Emotional Distress</u>

Defendants seek summary judgment on plaintiff's two separate

claims for negligent and intentional infliction of emotional

distress. First, defendants correctly point out that the

exclusivity clause of the New Hampshire's Workers' Compensation

Law bars some of Rossi's claims for infliction of emotional

distress. The exclusivity clause provides:

> **281:12 Employees Presumed to have Accepted.** An
> employee of an employer subject to this chapter
> shall be conclusively presumed to have accepted
> the provisions hereof and on behalf of himself, or
> his personal or legal representatives, to have
> waived all rights of action whether at common law
> or by statute or otherwise:
> I. Against the employer or the employer's
> insurance carrier; and
> II. Except for intentional torts, against any
> officer, director, agency, servant or employee
> acting on behalf of the employer or the employer's
> insurance carrier.

RSA 281:12 (1987).


42

Clearly, part I of the exclusivity clause bars both the intentional and negligent infliction of emotional distress claims against the municipality. In addition, part II of the clause bars the negligence claim against Peter Flynn, Paul Scott, and David Rowell as servants of a participating employer. Part II, however, permits plaintiff's claim for intentional infliction of emotional distress against the individual defendants.

Next, defendants argue that plaintiff cannot establish a prima facie case for intentional infliction of emotional distress. The RESTATEMENT notes:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

RESTATEMENT (SECOND) OF TORTS § 46, at 73 (1965). This court holds as a matter of law that recitation of the fact that defendants placed a police guard on Rossi would not arouse resentment in the breast of an average member of the community leading him to exclaim, "Outrageous!"

43

## Conclusion

For the foregoing reasons, the motion for summary judgment as to defendants Peter Flynn, Paul Scott, and David Rowell is granted in its entirety.  The motion is also granted as to the Town of Pelham except as to the section 1983 claim based on the unreasonable search of plaintiff Rossi's office.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

September 29, 1997

cc:    Michael L. Donovan, Esq.
       Donald E. Gardner, Esq.
       Diane M. Gorrow, Esq.

44