**Kenneth M. ZERAN, Plaintiff,**

v.

**DIAMOND BROADCASTING INC., an Illinois corporation d/b/a KRXO Radio, Defendant.**

**No. Civ–96–0008–T.**

United States District Court, W.D. Oklahoma.

Dec. 29, 1997.

James A. Ikard, Abel Musser Sokolosky Mares & Kouri, Oklahoma City, OK, Leo Kayser, Kayser & Redfern, New York City, for Plaintiff.

Jon Epstein, Robert D. Nelon, Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, for Defendant.

## ORDER

RALPH G. THOMPSON, District Judge.

Plaintiff Kenneth M. Zeran instituted this action against defendant Diamond Broadcasting Inc. d/b/a KRXO Radio ("KRXO"), asserting defamation, false light invasion of privacy, intentional infliction of emotional distress and punitive damages claims. KRXO has filed a motion for summary judgment, which the court concludes should be granted. The rationale for the court's deci-

sion follows a summary of the undisputed facts.[1]

The defendant owns and operates radio station KRXO in Oklahoma; its signal covers the Oklahoma City metropolitan area and can be heard a maximum radius of approximately seventy-five miles. In 1995, KRXO aired "Shannon and Spinozi," a weekday morning "drive time" talk show from 5:30 a.m. until 9:00 a.m. The show's hosts, Mark Shannon[2] and Ron Benton, did not report the news during their morning program, but occasionally commented about news items. During this time period, the plaintiff resided in Seattle, Washington, where he was engaged in several business projects or ventures, including publishing The Apartment Special, a free guide which listed apartments available for rent in the Seattle area. He officed and had a business telephone in a room in his parent's home, where he lived.

Beginning on April 25, 1995, advertisements bearing the plaintiff's business phone number and the name "Ken ZZ03," or some variation of it, appeared as postings on American Online ("AOL").[3] The ads were for t-shirts and other items that made offensive references to the bombing of the A.P. Murrah Building in Oklahoma City. Interested buyers were told to call and "Ask for Ken."[4] The plaintiff neither subscribed to AOL nor posted the message but, because of the advertisements, began to receive nasty, threatening phone calls.

On April 29, 1995, an AOL subscriber using the screen name "EckieA" and identify-

ing himself as "Eck" (Hollywood) Prater, e-mailed a copy of the April 25 AOL posting to Mark Shannon, who first saw it either late on April 30 or early in the morning on May 1. Shannon, who did not know Prater,[5] tried unsuccessfully to e-mail Ken ZZ03 through AOL. The response he received indicated that Ken ZZ03 was not an AOL member or was no longer using that screen name. Shannon did not try and call the phone number listed on the advertisement because it was before normal business hours.

On May 1, 1995, during the morning broadcast, Shannon commented on the ad being on AOL and read portions of the posting on the air, including the slogans purportedly displayed on the t-shirts. He urged listeners to call the plaintiff's telephone number, which he read repeatedly on the air, and let the seller know what Oklahomans thought of him.[6] He also engaged in a dialogue with his co-host, Spanoza, about the posting. Shannon attested that he believed that the ad was real, that someone actually was selling the t-shirts.[7]

Although the plaintiff had already received numerous calls prior to May 1, 1997, as a result of the broadcast the calls increased. Following the broadcast, the plaintiff also received death threats. The plaintiff called KRXO on May 1, 1995 and advised the station's general manager, Vance Harrison, Jr., that he had nothing to do with the AOL posting and requested that the station broadcast a retraction. Harrison told the plaintiff that KRXO would state on the air that the person at the phone number given out during

---

1. To the extent a factual dispute exists, it has been resolved in the plaintiff's favor. The evidence submitted by the parties and the reasonable inferences from it have been viewed in the light most favorable to the plaintiff, the party opposing summary judgment. *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1440 (10th Cir.1996).

2. His real name is Mark Fullerton.

3. The person posting the first advertisement, which appeared on April 25, used the screen name "Ken ZZ03;" in the second advertisement, which followed on April 26, "KEN ZZ033" was used. In the final three ads, which were all posted on April 28, the screen name was "KEN Z033."

4. The advertisements appearing on the April 26 and 28 all said, "Due to high demand please call back if busy."

5. Shannon thought he knew who Prater was, but later learned he was mistaken.

6. Shannon did not recall if he used the name "Ken" during the broadcast.

7. Shannon admitted during his deposition that the had been able to talk to the plaintiff before the broadcast and had learned the facts, including that AOL had confirmed that the plaintiff was not Ken ZZ03 and that the FBI was investigating the matter, that, while he still would have read the posting, he would not have announced the phone number.

the morning show had claimed he was not connected to the t-shirt sales. This was announced twice during the May 1, 1995 afternoon drive time show and once the next morning during the Shannon and Spinozi show.

The plaintiff does not know of anyone who knows him or knows of him by the name Ken Zeran, who saw the AOL postings,[8] heard the May 1 broadcast on KRXO, or associated him with "Ken Z" or the phone number on the AOL advertisements. He "admits that he cannot identify by name anyone who thinks less of him today than they did before the postings." Plaintiff's brief, p. 16.

On April 28, 1995, the plaintiff contacted the FBI about the advertisements and phone calls and subsequently notified the local police department. As a result of the postings and KRXO broadcast, the plaintiff suffered sleep deprivation and anxiety. He saw his family physician once and was prescribed an anxiety drug/sleeping pills. The plaintiff was unable to identify any specific interferences with his businesses or projects that were caused by the AOL postings and the KRXO broadcast.[9] The plaintiff instituted this action against the defendant, claiming KXRO defamed him, invaded his privacy and intentionally inflicted emotional distress upon him.

Slander is a false and unprivileged publication which (1) charges a person with a crime; (2) accuses him of having an infectious, contagious or loathsome disease or (4) being impotent or promiscuous; (3) maligns him with respect to his office, profession, trade or business,[10] or (5) by its natural consequences, causes actual damage. Okla.Stat. tit. 12, § 1442 (1991). The only possible category into which the KXRO broadcast can fall is § 1442(5), which constitutes slander per quod.

■ KRXO contends it is entitled to summary judgment on the plaintiff's defamation claim because the plaintiff has not shown the special damages required to sustain a slander per quo claim; the broadcast was not "of and concerning" the plaintiff, there was no actual injury to the plaintiff's reputation; the plaintiff can prove no false statement of fact and he cannot establish fault. Assuming that the plaintiff has demonstrated the requisite "special damages,"[11] the evidence is insufficient to establish any injury to his reputation. "In an action for libel, recovery is sought primarily for the injury to one's reputation. The focus of the action is on the effect of the publication on what others may think of the person." *Colbert v. World Pub. Co.*, 747 P.2d 286, 289 (Okla.1987).[12] As explained by the Oklahoma Supreme Court, "[t]he tort of defamation, which has been somewhat limited by the United States Supreme Court, protects individuals' *reputations.*" *Guinn v. Church of Christ*, 775 P.2d 766, 778 n. 44 (Okla.1989). In the absence of any proof that the plaintiff's reputation was impaired,[13] his defamation claim cannot be

---

8. The plaintiff asserts that he did, however, become known to KRXO listeners as the "Ken" who was selling the t-shirts.

9. The plaintiff did not plead any economic damages in his complaint. Defendant's exhibit F, p. 2. Plaintiff's response to defendant's document production requests.

10. The plaintiff futilely tries to argue that the statements made by Shannon and Benton on the air were slander per se, as "the broadcast interrupted the process of developing Halloween USA... and interfered with accomplishing his business requirements and fulfillment of the Apartment Special and the Puget Sound Money Connection." See *McCullough v. Cities Service Co.*, 676 P.2d 833, 834 (Okla.1984) ("In order that words shall be libelous per se as disparaging a person in his trade or business, they must have been spoken of plaintiff in relation thereto, and be of such a character as would prejudice him by impeaching either his skill or knowledge, or attacking his conduct in such business.") (quoting *Kee v. Armstrong, Byrd & Co.*, 75 Okla. 84, 182 P. 494 (1919)).

11. It is questionable whether the medical expenses the plaintiff incurred are sufficient to establish the required special damages.

12. *Colbert*, the Oklahoma Supreme Court explained the distinction between libel, which focuses on other individuals' perceptions of the defamed party, and the tort of false light invasion of privacy, which "vindicate[s] ... the injury to the person's own feelings." *Colbert*, 747 P.2d at 289.

13. There is no evidence that anyone who called the plaintiff in response to the postings or the broadcast even knew his last name, and the plaintiff cannot identify a single person in the world who thinks less of him today than they did

sustained.[14]

■ In *Colbert*, 747 P.2d at 290, the Oklahoma Supreme Court specified the elements of a false light invasion of privacy claim:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* (quoting *McCormack v. Oklahoma Pub. Co.*, 613 P.2d 737, 740 (Okla.1980)). Mere negligence is not sufficient to establish the requisite fault necessary to hold a defendant liable for false light invasion of privacy—the defendant must have "had a high degree of awareness of probable falsity or in fact entertained serious doubts as to the truth of the publication." *Colbert*, 747 P.2d at 291. While the defendant's employees acted negligently, there is no proof that they knew that the ads were fictitious or acted "recklessly," as that term is defined by the controlling authorities. Cf. *Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (in a libel action involving a public figure, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard"). The plaintiffs own expert attested, in essence, that the defendant's conduct did not satisfy the level of culpability necessary to impose liability: "Mark Shannon and Ron Benton were extremely negligent and violated standards of professional conduct when hosting the Shannon and Spinozi Show on May 1, 1995" and "failed to perform at a minimally acceptable level of professionalism." Plaintiff's Exhibit M, Affidavit of Jay

Black. Mr. Black notably avoided using the term "reckless." KRXO is, therefore, entitled to summary judgment on the plaintiff's false light invasion of privacy claim.

■ An evidentiary deficiency also bars the plaintiff's claim for intentional infliction of emotional distress. In *Eddy v. Brown*, 715 P.2d 74, 76 (Okla.1986), the Oklahoma Supreme Court noted that Oklahoma recognizes intentional infliction of emotional distress as an independent tort, which is governed by the narrow standards of the Restatement (Second) of Torts § 46 (1977). Section 46 provides in pertinent part:

> One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Comment d to § 46 specifies that liability for the tort does not extend "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

■ The trial court is given the initial responsibility under Oklahoma law "to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards. Only when it is found that reasonable men would differ in an assessment of this critical issue may the tort-of-outrage claim be submitted to a jury." *Eddy*, 715 P.2d at 76–77. To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must demonstrate:

> (1) that the tortfeasor acted intentionally or recklessly; (2) that the tortfeasor's conduct was extreme and outrageous; (3) that plaintiff actually experienced emotional distress; and (4) that the emotional distress was severe.

*Katzer v. Baldor Elec. Co.*, 969 F.2d 935, 939 (10th Cir.1992). *Accord Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir.1995)

---

before the broadcast. The cases cited by the plaintiff on this issue are clearly distinguishable.

**14.** Because of this holding, it is unnecessary to address the other bases asserted by the defendant in support of its request for summary judgment

on the plaintiff's defamation claim. Also, as the plaintiff's punitive damages claims are ancillary, the disposition of the tort claims governs his claims for extraordinary damages.

■ The plaintiff has failed to submit evidence sufficient to prove that KXRO's disc jockeys acted intentionally or recklessly or behaved in an extreme or outrageous, manner towards him. *See Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1387–89 (10th Cir.1991). "Nothing short of '[e]xtraordinary transgressions of the bounds of civility' will give rise to liability for intentional infliction of emotional distress." *Starr,* 54 F.3d at 1558 (quoting *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 432 (10th Cir.1990)). While the court sympathizes with the plaintiff and acknowledges and does not intend to belittle the distress and discomfort he experienced, the evidence he has submitted fails to show that the level of distress was sufficiently severe to make it actionable as a matter of law.[15] Therefore, the defendant also is entitled to summary judgment on the plaintiff's intentional infliction of emotional distress claim. *Id.*

Accordingly, the defendant's motion for summary judgment is granted.[16]

**15.** The distress must be "of such a character that 'no reasonable person could be expected to endure it.'" *Daemi,* 931 F.2d at 1389 (quoting Restatement (Second) of Torts § 46 cmt j.) Significantly, the plaintiff did not discuss his psychological injury with any relative or friend.

**16.** The court is not, by its rulings, condoning, in the slightest, the behavior of the radio station's employees, but is constrained by the applicable law to reach these decisions on the plaintiff's claims.