Young v. Plymouth State College       CV-96-075-JD   09/21/99
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Leroy S. Young and Tatum Young

        v.                                Civil No. 96-75-JD

Plymouth State College,
University System of New Hampshire,
and Donald P. Wharton


                          O R D E R


    The plaintiffs, Leroy and Tatum Young, bring a civil rights
action and related state law claims against Leroy Young's former
employer, Plymouth State College, the University System of New
Hampshire, and the college president, Donald P. Wharton.  The
Youngs allege that the defendants terminated Young's employment,
based on students' charges of sexual harassment, in violation of
his Fourteenth Amendment due process rights and in breach of the
requirements of the Faculty Handbook.[1]  They also contend that
defendant Donald Wharton's press conference about the charges
constituted defamation and an invasion of privacy.  The
defendants move for summary judgment on all of the plaintiffs'
claims.

---

    [1]Although the plaintiffs state, in the jurisdictional
statement of their complaint, that their claims arise under the
First and Fourteenth Amendments, they do not allege a claim under
the First Amendment.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party and a 'material' fact is one that might affect the outcome of the suit under governing law." Fajardo Shopping Ctr. v. Sun Alliance Ins. Co., 167 F.3d 1, 7 (1st Cir. 1999). When considering a motion for summary judgment, the record evidence is taken in the light most favorable to the nonmoving party. See Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999). To avoid summary disposition, a party opposing a properly supported motion for summary judgment must present record facts showing a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2

<u>Background</u>[2]

The plaintiffs, Leroy and Tatum Young, are husband and wife. Leroy Young was a tenured full-time associate professor in the Art Department at Plymouth State College in August of 1993 when a student, Jennifer Otten, complained about Young's language and conduct toward her. The Dean of Faculty, Theodora Kalikow, and the Dean of Student Affairs, Richard Hage, reported Otten's complaint to the college president, Donald Wharton. Kalikow and the College's Director of Personnel, Suz-Ann Ring, met with Young to discuss Otten's complaint. Young felt that Kalikow and Ring demonstrated an anti-male hostility. An attorney representing Young wrote to Kalikow on September 16, 1993, about the complaint and the College's procedures in handling the complaint.

On September 17, 1993, Kalikow reported to Wharton that she had received a complaint about Young from another student, Rose Marie Bente, who said that Young had sexually harassed her and

---

[2]The background facts are taken from the parties' factual statements. The court notes that the plaintiff improperly included argument and legal characterizations in his factual statement. <u>See</u> LR 7.2(b)(2). To the extent the plaintiff does not dispute the defendants' properly supported facts, they are deemed admitted for purposes of summary judgment. <u>Id.</u> Since neither party challenges the affidavits submitted by the other, any objections are deemed waived. <u>See</u> <u>Casas Office Machs. v. Mita Copystar America</u>, 42 F.3d 668, 682 (1st Cir. 1994) ("Unless a party moves to strike an affidavit under Rule 56(e), any objections are deemed waived and a court may consider the affidavit.").

made threatening statements toward Otten. Wharton asked Kalikow to notify Young to have no further contact with Otten or Bente until the complaints were resolved. Kalikow sent a letter to that effect on October 1.

In early October, a former Plymouth State College student, Tracy Schneider, sent Kalikow a letter alleging that she had been sexually harassed by Young while she was a student from November of 1990 until June of 1992. Schneider decided not to provide more information about her allegations after Kalikow told her that the period for filing a formal complaint had expired. In mid-October, Otten and Bente made formal complaints of sexual harassment against Young. Otten and Bente received help from Kalikow and from the College's general counsel in drafting their complaints.

On October 22, 1993, Wharton met with Young and asked him to take an administrative leave of absence with pay until the complaints by Otten and Bente were resolved. Young accepted, under protest, Wharton's offer of a temporary leave with pay. Young was barred from the campus, and his classes were reassigned to other professors.

The College's Sexual Harassment Hearings Panel convened on November 5, 1993, to consider Otten's complaint against Young. On November 6, the Panel delivered its report in which the Panel

4

concluded "that sexual harassment did occur in that unwelcome sexual advances, unwelcome touching and other verbal and physical conduct of a sexual nature occurred which had the effect of unreasonably interfering with Ms. Otten's academic environment." Defs. Ex. 12. The Panel recommended that a letter of warning be placed in Young's file, that provisions should be made for Otten to work with other faculty, that Young receive training including classroom observation, and that Young should not return to teaching "until the administration is satisfied that it is appropriate." Id. In response, on November 15, Wharton notified Young by letter that a letter of reprimand would be placed in his file and that he would be suspended for sixty days without pay. Young appealed the Panel's decision.

The University System's General Counsel, Ronald Rodgers, told Wharton that he had been contacted by Attorney Ken Brown representing Otten and Bente and that they intended to file suit against the College. Brown later notified Rodgers that Bente did not intend to pursue her complaint filed with the College, and that he had talked with Schneider about her allegations of sexual harassment against Young. Rodgers and Dean of Students Hage met with Schneider at Brown's office on December 1, 1993. Schneider related a series of events of a sexual nature with Young between the fall of 1990 and the summer of 1992. Schneider also said

5

that she had told several other students about Young's actions when they happened, and that those students discussed her allegations against Young with two other professors. Hage reported Schneider's allegations to Wharton. At about the same time, Otten, Bente, and Schneider, represented by Brown, served a state writ of summons to initiate actions against Young, the College, and the University System of New Hampshire. Each of the plaintiffs filed affidavits in connection with the suit detailing their allegations.

Wharton and Rodgers met with Leroy and Tatum Young and their attorney, Michael Garner, on December 29, 1993. Wharton described Schneider's allegations against Young, and Young denied them. Young also told Wharton that he had taken a polygraph test with respect to Schneider's allegations and gave him a copy that showed Young's denials of three major incidents alleged by Schneider were truthful. Young told Wharton that Schneider had given him gifts including a book of love poetry, a bottle of Scotch, and an inscribed copy of the book, The Thorn Birds. Wharton said that he would investigate the matter further.

At Wharton's request, Rodgers interviewed the two professors who Schneider identified as having known about her allegations of Young's harassment soon after it happened. The two professors confirmed that students had reported the harassment to them, and

6

one said she had offered assistance to Schneider who refused to speak without a promise of absolute confidentiality. Wharton interviewed Schneider who repeated her allegations and also told Wharton that Young had given her gifts during the period. Wharton also interviewed the two professors, and called two former students, whom Schneider said she told about the incidents. The professors and the former students confirmed Schneider's story.

In January of 1994, Wharton called Young to tell him that he would not be teaching at the beginning of the spring semester. Wharton and Young planned to meet on February 2, 1994, but when Young's wife accompanied him, Wharton canceled the meeting. On February 6, the Sexual Harassment Appeals Panel overturned all but one of the findings of the Sexual Harassment Panel that the incidents alleged by Otten constituted sexual harassment, and also found that the investigation of the complaint had been inadequate. The Appeals Panel reversed the sanctions previously imposed but also imposed new restrictions on Young's activities. In response, Wharton wrote to Young that his administrative leave would continue with pay pending resolution of the investigation of Schneider's allegations.

Wharton wrote to William Farrell, Chancellor of the University System of New Hampshire, on February 17, 1994,

7

providing him with a chronology and detail about the complaints and allegations against Young.  At the end of the letter, Wharton wrote that he intended to charge Young with "deliberate and flagrant neglect of duty and moral delinquency," to meet with him, and unless an agreement could be reached, to dismiss Young. Pl. Ex. 20.  Wharton met with Leroy and Tatum Young and the College's general counsel, Rodgers, on March 3, 1994.  The Youngs' attorney was notified of the meeting but could not attend.  Wharton discussed Schneider's allegations including the gifts and told Young he found Schneider's story to be credible. When asked, Wharton refused to identify the students and faculty who had confirmed Schneider's allegations.  Young denied all of Schneider's allegations.  Young says he understood the meeting was related to the lawsuit, and did not realize that he might face dismissal from his job.

Wharton wrote to Young in a letter dated March 15, 1994, "[a]s you well know, a former student of yours, Tracy Schneider, recently complained to Plymouth State College about your treatment of her while she was a student."  Pl. Ex. 25.  Wharton said he had concluded that he had "no choice but to initiate a dismissal action" against Young and under the faculty personnel policies he charged Young "with deliberate and flagrant neglect of duty and moral delinquency of a grave order tending to injure

8

the reputation of the College." Id. Wharton also noted the personnel policy requirement that he meet with Young to try to resolve the problem and set a meeting for March 21 at Wharton's office. At the meeting on March 21, Wharton gave Young copies of pages of the Faculty Handbook pertinent to dismissal proceedings and asked if he had any proposal to resolve the problem without dismissal. Young denied the charges and said he would oppose dismissal. Wharton said that his only choice was dismissal.

Wharton wrote to Young on March 25, 1994, notifying him that he was dismissed from the faculty. On March 28, Wharton announced Young's dismissal in a press release in which Wharton discussed Schneider's charges against Young and attached Schneider's affidavit. On the same day, Chancellor Farrell sent a confidential memorandum to the members of the board of trustees of the University System of New Hampshire notifying them of Wharton's decision to dismiss Young.

Under the provisions of the Faculty Handbook, Young sought an appeal to the Faculty Review Committee of Wharton's decision to dismiss him. On April 19, 1994, the Faculty Review Committee sent a letter to Wharton stating that it would submit findings without making any recommendation. Pl. Ex. 30. The Committee found that Young was exonerated by the Sexual Harassment Appeals Panel of the charges brought against him, that the Appeals

9

Panel's recommendation to reinstate Young was not followed, that the Review Committee lacked jurisdiction over Schneider who was no longer a student and was not "privy to all of the information which might have formed the basis of the president's decision." Id. The Review Committee found that Young presented a "prima facie case in his defense" and said that it "was unable to determine the basis of the extraordinary form and content of the President's press release on Professor Young." Id. Finding the case "extraordinary," the Review Committee found a need for new policies and procedures to involve faculty representatives in a decision to dismiss tenured faculty. Id.

Young sought to appeal the Review Committee's report. After some initial confusion due to the nature of the Review Committee's decision, an Appeal Committee was established to "review the case to determine whether Professor Young was properly dismissed for cause by President Wharton in accordance with the Faculty Handbook." Pl. Ex. 39. The appeal hearing was held on May 5, 1995. Both Young and the College were represented by counsel at the hearing. The Appeals Committee heard testimony from Schneider, Leroy Young, Tatum Young, Wharton, one of the students in whom Schneider had confided, and the two professors who had heard about Schneider's allegations while she was a student.

On November 27, 1995, the Appeal Committee issued its report and recommendation with a dissent by two members. The Appeal Committee found that Wharton "did not properly interpret and apply the Faculty Handbook procedures regarding dismissal for cause when he made Professor Young's dismissal effective immediately," that the press release was "inappropriate and potentially damaging for all parties concerned," that Wharton "did not have a sufficient basis for effecting Professor Young's dismissal," and "that a 3-2 majority of the Committee finds the evidence now before it sufficient to recommend dismissal for cause." Defs. Ex. 23 at 22. Based on its findings, the Appeal Committee recommended that Young's dismissal be rescinded, that "the College negotiate a monetary sum due Professor Young in lost pay and benefits for the period from the commencement of his suspension without pay to the conclusion of all proceedings," and, unless further appeals were available, that Young be dismissed for cause at the conclusion of all proceedings. Id.

Young's attorney notified the College's counsel that Young had decided not to seek any further hearing of the matter. Wharton sent Young a letter on January 12, 1996, notifying him that his official records would be modified to change his status on March 25, 1994, from "dismissed" to "suspension with pay" and that the College would pay him for lost salary and benefits as

11

recommended by the Appeal Committee.  Wharton also notified Young that subject to further appeal, he was dismissed for cause as of the date of the letter.  Pl. Ex. 41.

Young says that the writ of summons alleging claims by Otten, Bente, and Schneider which was served on his counsel on January 3, 1994, was not entered in Grafton County Superior Court by the return date causing their suit to lapse.  He also says that Otten and Bente voluntarily dismissed their claims after they were pending in Grafton County Superior Court.  On May 28, 1995, Schneider sued the College and the University System of New Hampshire alleging claims based on sexual harassment by Young. The outcome of Schneider's suit is unknown.  Young brought this suit against the College, the University System, and Wharton in February of 1996.


## Discussion

Leroy Young brings claims under 42 U.S.C.A. § 1983 alleging that the defendants violated his procedural and substantive due process rights in terminating his employment.[3]  He also alleges that the defendants breached the provisions of the Faculty

---

[3]Although Young mentions violations of his First Amendment rights in his objection to summary judgment, his does not appear to have alleged a claim based on violation of his First Amendment rights.

Handbook and their duty of good faith and fair dealing, and that the news release was defamatory and put Young in a false light. Tatum Young brings a claim for loss of consortium.

The defendants move for summary judgment on several grounds. The College and the University System argue that they are not liable under 42 U.S.C.A. § 1983 based on a respondeat superior theory, and they contend that the plaintiffs have not pled and cannot show that a policy or practice existed which caused a violation of Young's due process rights. The defendants also contend that Young cannot prove either his procedural or substantive due process claims. The defendants move for judgment in their favor on the claims based on the Faculty Handbook on grounds that the Handbook disclaimed any contractual obligation, that all of the proceedings complied with the Handbook, and that Young waived claims of breach by not pursuing grievance procedures provided in the Handbook. As to the defamation and invasion of privacy claims, the defendants assert that Wharton was privileged to make the news release, that Young was a public figure and would not be able to prove malice, and that the information in the release was not false.

13

A.  Section 1983 Claims Against the College and the University
    System[4]

    The defendants do not contest that the College and the
University System are "persons" within the meaning of section
1983.[5]  Government entities, such as the College and the
University System, are not liable under section 1983 based on a
theory of vicarious liability.  See Monell v. New York City Dept.
of Social Servs., 436 U.S. 658, 689 (1978).  Therefore, a
governmental entity "may not be sued under § 1983 for an injury
inflicted solely by its employees or agents."  Id. at 694.
"Instead, a plaintiff seeking to impose liability on a
[government entity] under § 1983 must identify a [governmental]

---

    [4]Young's § 1983 claims against Wharton in his official
capacity are construed as claims against the College and
University System.  See Negron Gaztambide v. Hernandez Torres,
145 F.3d 410, 416 (1st Cir. 1998).

    [5]Section 1983 provides in pertinent part:

    Every person who, under color of any statute,
    ordinance, regulation, custom, or usage, of any State
    or Territory or the District of Columbia, subjects, or
    causes to be subjected, any citizen of the United
    States or other person within the jurisdiction thereof
    to the deprivation of any rights, privileges, or
    immunities secured by the Constitution and laws, shall
    be liable to the party injured in action at law, suit
    in equity, or other proper proceedings for redress.

'policy' or 'custom' that caused the plaintiff's injury." <u>Silva v. Worden</u>, 130 F.3d 26, 30-31 (1st Cir. 1997); <u>see also</u> <u>Harris v. District Board of Trustees of Polk Community College</u>, 9 F. Supp. 2d 1319, 1330 (M.D. Fla. 1998) (considering <u>Monell</u> criteria in context of college's liability); <u>Harel v. Rutgers</u>, 5 F. Supp. 2d 246, 267 (D.N.J. 1998) (same).

A policy, custom, or practice is attributable to the governmental entity only if established by the entity's "duly constituted legislative body or by those officials whose acts may fairly be said to be those of the [governmental entity]." <u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403-04 (1997); <u>accord</u> <u>Silva v. Worden</u>, 130 F.3d 26, 30 (1st Cir. 1997). To constitute governmental policy for purposes of § 1983 liability, the official must have "final authority to establish municipal policy with respect to the action ordered." <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 481 (1986). In addition, there must be a direct link between a policy attributable to the governmental entity and a deprivation of the plaintiff's federal rights. <u>See</u> <u>Brown</u>, 520 U.S. at 404. A single decision or act by a policy maker may constitute policy attributable to a governmental entity if that conduct directly resulted in a deprivation of federal rights. <u>See</u> <u>id.</u> at 405-06; <u>see also</u> <u>Rossi v. Town of Pelham</u>, 35 F. Supp. 2d 58, 77 (D.N.H. 1997). Once an official policy is

established, the plaintiff must also show that the decision was made with the requisite level of culpability. See Brown, 520 U.S. at 411.

Leroy Young argues that President Wharton and Chancellor Farrell were policy makers for the College and the University System. He contends that Wharton's decision to dismiss him, allegedly without due process, constituted policy for the College and that Farrell's alleged approval of the decision constituted policy for the University System. Young provides no specific evidence in response to the motion for summary judgment that either Wharton or Farrell was the final decision maker with respect to decisions to dismiss tenured faculty, which is the policy at issue in this case. Cf. McHenry v. Pennsylvania State Sys. of Higher Educ., 50 F. Supp. 2d 401, 416 n.21 (E.D. Pa. 1999).

The record itself, however, offers some proof that Wharton was the final decision maker as to whether or not to dismiss Young since Wharton's decision directly resulted in Young's dismissal. In any case, the defendants do not appear to contest Wharton's authority to make final decisions on dismissal of tenured faculty. Neither party has discussed the effect of the appeals process on the finality of Wharton's decision.

In contrast, the record shows that Chancellor Farrell merely

passed Wharton's decision along to the Board of Trustees of the University System and does not indicate that he had any decision-making authority as to the dismissal.  Young does not argue that Wharton operated as the final decision maker for the University System.  Since Young has not shown a triable issue that his dismissal was caused by the University System's policy, summary judgment is appropriate in favor of the University System as to Young's § 1983 claims.

Wharton's decision to dismiss Young, allegedly made without affording Young due process, is a decision with a direct causal nexus to the harm alleged that could constitute policy based on a single decision.  See Brown, 520 U.S. 504-506.  Since factual issues remain as to whether Wharton's decisions are attributable to the College as policy, summary judgment is not appropriate for the College.[6]

B.  Due Process

The defendants do not contest that Leroy Young had a constitutionally protected property interest in his tenured position.  They contend, however, that Young received all of the process due under the constitution in the course of the dismissal

_____

[6]The defendants have not challenged Young's evidence as to the level of culpability of the decision.

proceedings.  The defendants also contend that because a postdeprivation remedy, in the form of a state law breach of contract claim, is available, he is not entitled to recover for any procedural due process deficiencies.  In addition, the defendants argue that Young cannot show that their actions constituted a violation of his substantive due process rights.

1.  Procedural Due Process

The First Circuit has interpreted the requirements of procedural due process under circumstances involving the dismissal of a tenured university professor in Cotnoir v. University of Maine Sys., 35 F.3d 6 (1st Cir. 1994).  "Procedural due process guarantees an affected individual the right to some form of hearing, with notice and an opportunity to be heard, before he is divested of his protected interest."  Id. at 10.  Included in the right to notice is a requirement that notice be provided of the proposed action.  Id. at 11.

Young contends that he was neither properly notified of the charges against him nor notified of the proposed action at a meaningful time.  Although his dismissal was ostensibly based on the sexual harassment charges made by Tracy Schneider, Young contends, citing Wharton's deposition testimony, that Wharton also improperly and without notice to him considered Otten's and

18

Bente's charges, after both complaints had been resolved.  In addition, he says, supported by his affidavit, that he was not notified that Wharton planned to dismiss him until after the decision had been made and when he was offered little opportunity to present his case.  Based on the stringent notice requirements set forth in Cotnoir, Young has raised a material factual issue as to whether he received constitutionally adequate notice of the charges and proposed action against him.

Postdeprivation relief provides an exception to the requirement of predeprivation process only when predeprivation process was impossible, such as when the challenged actions were random and unauthorized, but not when the actions were pursuant to governmental policy.  See Zinermon v. Burch, 494 U.S. 113, 136-39 (1990); Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982); Brown v. Hot, Sexy and Safer Prods. Inc, 68 F.3d 525, 536 (1st Cir. 1995).  Actions by a final decision maker authorized to make particular policy in the challenged area generally are not random and unauthorized.  See Easter House v. Felder, 910 F.2d 1387, 1402 (7th Cir. 1990); Dwyer v. Regan, 777 F.2d 825, 831-33 (2d Cir. 1985); Verri v. Nanna, 972 F. Supp. 773, 793-94 (S.D.N.Y. 1997); cf. Cronin v. Amesbury, 81 F.3d 257, 260 n.2 (1st Cir. 1996) (postdeprivation remedies relevant where plaintiff alleged his termination resulted from defendants'

19

random and unauthorized actions). Since Young has raised material factual questions as to whether Wharton was a final policy maker for the College, the defendants cannot show that Wharton's actions were indisputably random or unauthorized. Therefore, summary judgment is not appropriate based on the availability of postdeprivation relief.

2. <u>Substantive Due Process</u>

Substantive due process prohibits impermissibly arbitrary governmental actions despite the fairness of the implementing procedures. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 840 (1998); <u>accord</u> <u>Licari v. Ferruzi</u>, 22 F.3d 344, 347 (1st Cir. 1994) ("Procedural due process guarantees that a state proceeding which results in a deprivation of property is fair, while substantive due process ensures that such state action is not arbitrary and capricious."); <u>Amsden v. Moran</u>, 904 F.2d 748, 753 (1st Cir. 1990) ("a substantive due process claim implicates the essence of state action rather than its modalities"). Recently, the Supreme Court has explained that the substantive due process analysis depends on whether legislation or the conduct of a governmental officer is at issue. <u>See</u> <u>Lewis</u>, 523 U.S. at 846. When an executive decision is challenged as a violation of substantive due process, the standard to be applied is whether or

not the conduct is conscience shocking; "[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847 and n.8.

Prior to Lewis, the First Circuit established that an arbitrary and capricious decision to dismiss a tenured teacher violates substantive due process. See Newman v. Massachusetts, 884 F.2d 19, 25 (1st Cir. 1989). In that context, a decision based on a trivial reason or a reason unrelated to the educational process was deemed to be arbitrary.[7] Id. at 24.

Young argues that Wharton's decision to dismiss him based on Schneider's charges, and influenced by Otten's and Bente's charges, was lacking in factual support and was therefore arbitrary. He contends that his polygraph results so undermined Schneider's credibility that Wharton had no basis to believe her. Wharton also characterizes Schneider's charges as trivial: "a tepid, almost bumbling affair." Pl. Memo. at 11.

Nothing in Wharton's decision making is sufficiently outrageous or egregious that a reasonable jury could find it

---

[7]Since Wharton's decision was not a "genuine academic decision," it is not entitled to the deference decisions based on an evaluation of academic criteria or credentials would be accorded. See Newman v. Burgin, 930 F.2d 955, 962 (1st Cir. 1991) (citing Regents of University of Michigan v. Ewing, 474 U.S. 214, 223 (1985)).

conscience shocking.  The decision to dismiss Young based on Schneider's charges of sexual harassment, perhaps influenced by the other charges of sexual harassment, even if wrong, was not outrageous.

If the Newman arbitrariness standard survives Lewis, the record does not show a sufficient lack of factual support for Wharton's decision to constitute arbitrary decision making.  See Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990) ("the requisite arbitrariness and caprice must be stunning"). Schneider's charges, if believed, describe sexual harassment, and dismissal of a teacher for sexual harassment of a student is not arbitrary or capricious.  See, e.g., Gebser v. Lago Vista Independent Sch. Dist., 524 U.S. 274 (1998) (discussing school's liability under Title IX for teacher's harassment of student). In fact, even Young's characterization of Schneider's allegations, as an attempt by a professor to instigate a "tepid" or "bumbling" affair with a student, could reasonably be found to amount to sexual harassment.  Therefore, under either standard, Young has not demonstrated a trialworthy issue on his claim of a violation of his right to substantive due process.  See, e.g., Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 529 (10th Cir. 1998).  Therefore, the defendants are entitled to summary judgment with respect to Young's substantive due process claim.

3.  <u>Qualified Immunity</u>

In a section 1983 case, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Wilson v. Layne</u>, 119 S. Ct. 1692, 1698-99 (1999) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)); <u>accord</u> <u>Sheehy v. Plymouth</u>, 1999 WL 685670 at *2 (1st Cir. Sept. 8, 1999).  The qualified immunity analysis, therefore, requires two steps to determine:  (1) whether the constitutional right in question, at the appropriate level of generality, was clearly established at the time of the challenged conduct; and (2) "whether a reasonable, similarly situated official would understand that the challenged conduct violated the established right." <u>Napier v. Windham</u>, 1999 WL 566567 at *4 (1st Cir. Aug. 6, 1999); <u>see also</u> <u>Brady v. Dill</u>, 1999 WL 508812 at *10 (1st Cir. July 22, 1999).

Leroy Young alleges that Wharton violated his right to procedural due process in the manner in which he decided to dismiss Young from his employment.  More specifically, Young charges that Wharton failed to give him notice that he might be dismissed at a meaningful time before he made the decision and

improperly relied in part on charges by Otten and Bente, which he had not told Young were included in the charges being considered against him.  Young also argues, less convincingly, that Wharton failed to provide him an adequate explanation of the evidence against him.

Procedural due process rights to be accorded a tenured professor before dismissing him from employment were clearly established in 1993 and 1994 when the events in question in this case occurred.  See Cotnoir, 35 F.3d at 10-11.  As discussed above, the facts pertaining to Wharton's decision-making process are disputed.[8]  In addition, the defendants argument in favor of qualified immunity that Wharton "carefully adhered to the provisions in the Faculty Handbook" is called into question by the Appeals Committee's conclusion that Wharton did not properly interpret or apply the pertinent provisions of the Handbook.

Summary judgment on qualified immunity grounds is appropriate only when there is no dispute as to material facts.  See Swain v. Spinney, 117 F.3d 1, 9 (1st Cir. 1997).  Wharton has not demonstrated that he is entitled to qualified immunity based on the record presented for summary judgment.

---

[8]The College, which is a government entity like a municipality, is not entitled to qualified immunity.  See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993).

24

C.  Breach of Contract

The defendants move for summary judgment on Young's breach of contract and related breach of the duty of good faith and fair dealing claims.  The defendants contend that Wharton complied with all of the Handbook provisions, that the Handbook disclaimer precludes the claims, and that Young waived his claims by not challenging the procedures during the administrative process.  A material factual dispute exists as to whether Wharton complied with the Handbook provisions, which precludes summary judgment based on the defense that no breach of the provisions occurred.

The question of whether an employer's handbook, manual, or policy statement creates an enforceable contract ordinarily arises in the context of an at-will employee whose employment is not otherwise subject to express contractual obligations.  See Butler v. Walker Power, Inc., 137 N.H. 432, 435-36 (1993).  Here, since Young was tenured, not an at-will employee, he was presumably subject to dismissal only for cause, and it is likely that he and the College had some contractual arrangement for his employment.  The defendants contend, based on the disclaimer, that the Handbook did not provide contractual provisions for handling the charges made against Young or his dismissal.

An employer's handbook or policy statement may form an enforceable unilateral contract.  See Panto v. Moore Business

25

<u>Forms, Inc.</u>, 130 N.H. 730, 735 (1988). An employer may avoid contractual obligations by including a sufficiently explicit disclaimer in the handbook. <u>See</u> <u>Butler</u>, 137 N.H. at 436-37; <u>see also</u> <u>Riesgo v. Heidelberg Harris, Inc.</u>, 36 F. Supp. 2d 53, 60 (D.N.H. 1997). The meaning of a disclaimer, as part of a contract, is construed as a matter of law. <u>Id.</u> at 435. The disclaimer is reviewed in the context of the entire agreement to determine the intent of the parties. <u>Id.</u>

The disclaimer in the "Handbook of the Plymouth State College Faculty" provides as follows:

> The University System and Plymouth State College reserve the right to change any of the policies, rules, or regulations at any time, including those relating to salary, benefits, promotion and tenure, termination, or any other term or condition of employment. All changes are effective at such times as the proper authorities determine whether or not those changes are reflected in this <u>Handbook</u>. Every effort has been made to ensure the accuracy of statements made in this <u>Handbook</u>, however, the actual terms and conditions of employment may differ from those described herein. Accordingly, this <u>Handbook</u> and its provisions do not, and should not be construed to create a contract of employment or establish any legally binding conditions of employment. If you have any questions concerning the current status or applicability of any provision described in this <u>Handbook</u> you should consult with the Dean of the College or the Director of Personnel.

Def. Ex. 2. A disclaimer that a handbook does not create a contract of employment refers only to the durational aspect of employment, not to other benefits or contractual relationships

26

described in the handbook.  See Butler, 137 N.H. at 437.  The question is whether the disclaimer language, "this Handbook and its provisions do not, and should not be construed to . . . establish any legally binding conditions of employment," effectively disclaims any agreement to abide by the complaint and termination procedures in the Handbook.  Since complaint and termination procedures may be reasonably construed to be included within the meaning of "conditions of employment," the Handbook, with sufficient specificity, disclaims any contractual right to implementation of those procedures.  See, e.g., Riesgo, 36 F. Supp. 2d at 60.

In addition, the disclaimer provides for changes in the College's policies, rules, and regulations, if changes are implemented by those with authority, whether or not such changes are included in the Handbook.  Young argues that Wharton is a final policy maker for the College who, therefore, has authority to implement changes in policy.  To the extent that Young argues Wharton's decisions and actions established the College's policies, those new policies, not the published Handbook provisions, would constitute enforceable College policy.  The resulting changed policy would negate Young's claims for breach of contract based on the provisions published in the Handbook.

Therefore, the Handbook disclaimer effectively prevented the

27

formation of any enforceable contract provisions with respect to the College's complaint and termination procedures. Young's claim alleging breach of the covenant of good faith and fair dealing is based on the alleged contractual obligations in the Handbook. Absent contractual obligations, the claim for breach of the covenant of good faith and fair dealing also fails. Accordingly, the defendants are entitled to summary judgment in their favor on the plaintiff's claim of breach of contract and breach of the covenant of good faith and fair dealing.

D. Defamation and Invasion of Privacy

Young brings claims for defamation and invasion of privacy alleging that the defendants defamed him and presented him in a false light in Wharton's press release about his decision to dismiss Young. The defendants, raising several defenses, assert that Young cannot prove either claim.

Under New Hampshire law, "[t]o establish defamation, there must be evidence that a defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993). "A statement is defamatory if 'it tends so to harm the reputation of another as to lower him

in the estimation of the community or to deter third persons from associating or dealing with him.'" <u>Faigin v. Kelly</u>, 1999 WL 498565 at *3 (1st Cir. July 19, 1999) (quoting Restatement, Second, of Torts § 559 (1977) and applying New Hampshire law); <u>see also</u> <u>Rossi v. Pelham</u>, 35 F. Supp. 2d 58, 74 (D.N.H. 1997).

The defendants argue that they were privileged to issue the press release. New Hampshire has recognized a conditional privilege "'if the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth,' provided that the statements are not made with actual malice." <u>Simpkins v. Snow</u>, 139 N.H. 735, 740 (1995) (quoting <u>Chagnon v. Union-Leader Co.</u>, 103 N.H. 426, 437 ((1961)). <u>But see</u> <u>Duchesnaye v. Munro Enterprises, Inc.</u>, 125 N.H. 244, 253 (1984) (holding that the <u>Chagnon</u> privilege was inconsistent with the negligence standard for proving defamation). To the extent such a privilege still exists under New Hampshire law, the defendant bears the burden of proving its application in a particular case. <u>See</u> <u>id.</u>

In support of their assertion of a conditional privilege, the defendants say only:

> It is a long-standing principle of New Hampshire law that a party cannot be held liable for a statement or publication tending to disparage private character if such a statement is called for by social duty or is necessary and proper to enable him to protect his own

29

> interests or those of another, provided the statement is
> made in good faith without the intent to defame.

Defs. memo at 16.  The defendants cite cases that predate <u>Chagnon</u>

and <u>Duchesnaye</u>.  They offer no factual basis to justify applying

the conditional privilege in this case.  Based on the record, the

defendants have not carried their burden to show that they were

privileged to issue the press release.

The defendants also argue that Young was a public figure

subject to a different and higher standard than a private

plaintiff.  In defamation actions, the plaintiff's status vis a

vis the public determines the level of First Amendment protection

accorded the defendant's speech.  See <u>Pendleton v. Haverhill</u>, 156

F.3d 57, 66 (1st Cir. 1998).  A purely private plaintiff, with no

public status, "can succeed in defamation actions on a state-set

standard of proof (typically negligence), whereas the

Constitution imposes a higher hurdle for public figures and

requires them to prove actual malice."  <u>Id.</u> (explaining evolution

of First Amendment standard in defamation).  A public figure

plaintiff must prove by clear and convincing evidence that the

defendant published the defamatory statements with actual malice.

See <u>Faigin</u>, 1999 WL 498565 at *4.  Plaintiffs hold "public

figure" status if they assume roles with particular prominence in

society such as "by occupying positions of 'persuasive power and

influence,'" or by "'thrust[ing] themselves to the forefront of

particular public controversies in order to influence the resolution of the issues involved.'" Pendleton, 156 F.3d at 67 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)). It is the defendant's burden to prove that the plaintiff is a public figure. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 592 (1st Cir. 1980); see also Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1553 (4th Cir. 1994).

The defendants contend that the controversy surrounding Young was a public controversy and that Young voluntarily thrust himself into the controversy by giving interviews to reporters, publishing a letter on campus, and holding a support rally. Young points out that there were different controversies, saying that the complaints filed with the College by Otten and Bente in the fall of 1993 were distinct from the later charges made by Schneider. The publicity attributable to Young that the defendants cite pertains to the Otten and Bente charges and the College's complaint procedures, not to the charges made by Schneider. In fact, the newspaper articles also refer to the College's press releases for much of their information.

To find public figure status requires "a detailed fact-sensitive determination" both as to whether a public controversy existed and "the nature and extent of the person's participation

31

in the controversy." <u>Penobscot Indian Nation v. Key Bank of</u> <u>Maine</u>, 112 F.3d 538, 562 (1st Cir. 1997) (quotation omitted). The record presented by the defendants is not sufficient to prove that a public controversy existed as to Schneider's charges and the College's actions or that Young voluntarily thrust himself into the controversy by seeking publicity on the issues to such an extent as to abandon his private status. The defendants, therefore, have not carried their burden to prove that Young was a public figure. The defendants' argument in a footnote, based on New York law, that the malice standard should apply simply because the issue was one of public concern is insufficient for consideration on summary judgment.

The defendants argue that Young cannot prove his claim of "false light" invasion of privacy because, they contend, he cannot show the publicity in the press release was false. While the New Hampshire Supreme Court said in dicta that it would recognize the tort of invasion of privacy based on a false light theory, the court provided little explanation of the elements of the claim other than publicity and falsity. <u>See</u> <u>Hamberger v.</u> <u>Eastman</u>, 106 N.H. 107, 110 (1964). The court has not had occasion since 1964 to consider false light invasion of privacy.[9]

---

[9]Other jurisdictions that recognize false light invasion of privacy follow the elements provided in the Restatement (Second) of Torts § 652 (1977):

The defendants argue that the press release was not false because Wharton properly determined that Schneider's charges were credible and he was authorized to dismiss Young. The propriety of Wharton's processes and the truth of his conclusions and statements, however, are hotly contested in this case. The defendants' asserted defenses of privilege and voluntary publicity fail for the same reasons as in the context of the defamation claims. The defendants have not demonstrated by undisputed facts that they are entitled to summary judgment on

---

One who falsely gives publicity to a matter concerning another that places the other in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

See, e.g., Ostrzenski v. Seigel, 177 F.3d 245, 252 (4th Cir. 1999 (applying Maryland law); Frobose v. American Savings and Loan Ass'n, 152 F.3d 602, 617-18 (7th Cir. 1998) (applying Illinois law); Moldea v. New York Times Co., 15 F.3d 1137, 1150 (D.C. Cir. 1994); McGhee v. Sanilac County, 934 F.2d 89, 94 (6th Cir. 1991) (applying Michigan law); Zeran v. Diamond Broadcasting Inc., 19 F. Supp. 2d 1249, 1253 (W.D. Okla. 1997); McCammon & Assoc., Inc. v. McGraw-Hill Broadcasting Co., 716 P.2ds 490, 492 (Colo. Ct. App. 1986).

Young's invasion of privacy claim.

Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 59) is granted as to the plaintiff's § 1983 claims against the University System, the substantive due process claim, and the claims of breach of contract and of the covenant of good faith and fair dealing.  The motion is otherwise denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

September 21, 1999

cc:  Thomas F. Kehr, Esquire
     Michael D. Urban, Esquire
     Joseph M. McDonough III, Esquire